E-FILED
Monday, 06 July, 2026 05:17:49 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**SPRINGFIELD DIVISION**

MILES DENNIS and JAYDEN DENNIS,

Plaintiffs,

v.

BRENDAN KELLY, in his official capacity as Director of the Illinois State Police,

Defendant.

No. 3:26-cv-03060-SEM-DJQ

Honorable Sue E. Myerscough

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' PRELIMINARY INJUNCTION MOTION**

Plaintiffs are 18-year-old twins who want to acquire and possess firearms. They ask the Court to preliminarily enjoin enforcement of the Illinois law that forbids them to do so unless they first obtain their parents' permission. But Plaintiffs are unlikely to prevail on the merits of their Second Amendment claim. The challenged law fits comfortably within our regulatory tradition restricting the firearm rights of people under the age of 21 because they may lack the maturity and judgment to use dangerous weapons responsibly. On top of this, Plaintiffs have not shown that they are suffering irreparable harm or that the relief they seek is in the public interest. The Court should therefore decline to issue a preliminary injunction.

**BACKGROUND**

Illinois law generally requires people first to obtain a Firearm Owner's Identification Card ("FOID card") from the Illinois State Police if they wish to acquire or possess firearms in this state. 430 ILCS 65/2(a)(1); *see id.* 2(b) (enumerating limited exceptions). FOID card applicants who are not "21 years of age or over" must (among other things) "[s]ubmit evidence to the Illinois State Police" establishing that they have their parent or legal guardian's "written

consent" to possess and acquire firearms. *Id.* 4(a)(2)(i-5). The applicant's parent or legal guardian who provides this written consent must also "file[ ] an affidavit with the Illinois State Police" affirming "that he or she is not an individual prohibited from" possessing a FOID card under Illinois law. *Id.*; *see* ECF 1 at 5. An applicant whose parents cannot or will not provide consent "may petition the Firearm Owner's Identification Card Review Board or the circuit court for relief." *People v. Thompson*, 264 N.E.3d 24, 32, 2024 IL App (1st) 221031, ¶ 27.

Plaintiffs are 18 years old and would like to apply for FOID cards from the Illinois State Police. ECF 1 at 1, ¶¶ 1-3 & n.1. Their parents do not "object to" Plaintiffs' possessing or acquiring firearms. *Id.* at 2, ¶ 9. And Plaintiffs' parents are not themselves "prohibited from possessing or acquiring firearms under federal or state law." *Id.* at 2, ¶ 10. Nevertheless, Plaintiffs' parents refuse to sign the affidavit required under 430 ILCS 65/4(a)(2)(i-5) because "they firmly believe that [Plaintiffs], as adults, should not have to get parental or other persons['] permission to apply for [a FOID card] and to legally possess firearms." ECF 11-1 at 2, ¶ 11.

Plaintiffs assert one claim contending that the Second Amendment forbids Illinois to impose parental consent and affidavit requirements on FOID card applicants between the ages of 18 and 20. ECF 1 at 3, ¶¶ 12-13. Defendant's motion to dismiss this claim is fully briefed and pending decision. ECFs 8 & 10. Meanwhile, four months after initiating this litigation, Plaintiffs filed a "Motion for Temporary Restraining Order and/or for Summary Judgment." ECF 11. Although the title of the motion references a temporary restraining order, the body of the motion clarifies that Plaintiffs are instead seeking a preliminary injunction. *E.g.*, *id.* at 3-4. Defendant is simultaneously moving the Court for a 60-day extension of time to respond to Plaintiffs' motion to the extent that they are seeking summary judgment. This filing responds to Plaintiffs' motion only to the extent that they are seeking a preliminary injunction.

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024). "A plaintiff seeking a preliminary injunction must establish a likelihood of success on the merits, a likelihood of suffering irreparable harm in the absence of preliminary relief, that the balance of equities tips in the plaintiff's favor, and that an injunction is in the public interest." *Minocqua Brewing Company LLC v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025). "[A] 'strong' showing of likelihood of success" is required. *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 397 (7th Cir. 2022).

## ARGUMENT

### I. Plaintiffs are not likely to succeed on their Second Amendment claim.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." "Of course, like most individual rights, the Second Amendment has its limits. American legislatures have long regulated the possession and use of firearms to some degree." *United States v. Hemani*, No. 24-1234, 2026 WL 1751710, at *4 (U.S. June 18, 2026) (citation omitted). Importantly, the Second Amendment right is not "coterminous with the Amendment's literal language": modern laws that restrict firearm rights nevertheless may be constitutional because they do "not infringe the historical understanding of the codified right." *Wolford v. Lopez*, No. 24-1046, 2026 WL 1825723, at *6 (U.S. June 25, 2026) (citations omitted).

Courts considering a Second Amendment challenge proceed in two steps. "First, a court must determine whether the law before it clashes with the 'plain text' of the Amendment's language. This inquiry entails three subsidiary questions. First, does the law apply to 'the people'—which is to say, to 'all members of the political community'? Second, does it concern

any form of ‘Arms,’ *i.e.*, any weapon customarily used for offensive or defensive purposes? Third, does the law place any restrictions on either the ‘keep[ing]’ (*i.e.*, possession) or the ‘bear[ing]’ (*i.e.*, carrying) of arms?” *Wolford*, 2026 WL 1825723, at *6.

If the challenged law does cover conduct within the Second Amendment’s plain text, the burden shifts to the government to demonstrate that the law is consistent with our historical tradition of firearm regulation. *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). “[T]o show that a contemporary regulation is consistent with this Nation’s historical tradition of firearm regulation, [the Supreme Court does] not require the government to point to a ‘historical twin’ or ‘precis[e] . . . historical precursors.’ Instead, [the Supreme Court has] said, ‘the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition.’ And, to that end, the government may ‘reaso[n] by analogy,’ showing that its contemporary regulation is ‘relevantly similar’ to ones ‘well-established’ in the Nation’s history.” *Hemani*, 2026 WL 1751710, at *5.

### A. Our regulatory tradition of “restricting access to firearms based on age for those considered to lack the judgment and discretion to use them safely.”

Even assuming that Plaintiffs are among “the people” who have Second Amendment rights, they are exceedingly unlikely to succeed on the merits of their claim. At the second step of the Second Amendment analysis, “[h]istory reveals a regulatory tradition of restricting access to firearms based on age for those considered to lack the judgment and discretion to use them safely.” *Picon v. United States*, 343 A.3d 57, 65 (D.C. 2025), *cert. denied*, 2026 WL 1871303 (U.S. June 30, 2026). “The Founders’ generation shared the view that minors lacked the reason and judgment necessary to be trusted with legal rights.” *NRA v. Bondi*, 133 F.4th 1108, 1117 (11th Cir. 2025) (en banc), *cert. denied*, 2026 WL 1871313 (U.S. June 30, 2026). “Because of their lack of reason, infants were subject to the ‘power’ of their parents until they reached age

21." *Id.* "Among the many legal disabilities that 'secure[d] [minors] from hurting themselves by their own improvident acts,' minors generally lacked the capacity to contract." *Id.* at 1118 (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES OF THE LAWS OF ENGLAND at 464-65 ("BLACKSTONE")). And this "inability to contract impeded minors from acquiring firearms during the Founding era." *Id.*

As in many Second Amendment challenges, the analysis begins on the other side of the ocean. In common law England, "a person under the age of 21 was considered an 'infant.'" *McCoy v. ATF*, 140 F.4th 568, 575 (4th Cir. 2025), *cert. denied*, 2026 WL 1871297 (U.S. June 30, 2026). "As Blackstone put it in his influential eighteenth-century treatise, 'an infant can neither aliene his lands, nor do any legal act, nor make a deed, nor indeed any manner of contract, that will bind him.'" *Id.* (quoting BLACKSTONE at 453). "English law set the age of majority at 21 years of age because of the relative lack of maturity and judgment of younger individuals." *NRA*, 133 F.4th at 1117. "The English view was that a child does not 'arriv[e] at years of discretion' until that age. When a child turned 21 years of age, 'the law . . . established' that 'the empire of the father, or other guardian,' should 'give[ ] place to the empire of reason.'" *Id.* (quoting BLACKSTONE at 453) (citation omitted); *see Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 124 (10th Cir. 2024) ("'Under English common law, individuals under the legal age of majority, 21, were entirely subsumed under the authority of their parents (usually their fathers) or guardians.'").

"Like many common law principles, the infancy doctrine made its way across the Atlantic, and early American courts routinely applied it." *McCoy*, 140 F.4th at 575 (citing cases); *see NRA*, 133 F.4th at 1117 (American "colonies 'adopted age twenty-one as the near universal age of majority'"); *Rocky Mountain*, 121 F.4th at 124 ("'Those between the ages of eighteen and

twenty (and indeed all under the age of 21) were considered "minors" or "infants" from the time of the nation's founding up through the latter half of the twentieth century.'"). For example, at "the time of the founding, an infant's inability to contract was a well understood and engrained principle of American law." *McCoy*, 140 F.4th at 575. And an early American dictionary defined a "minor" as: "'A person of either sex under age; one who is under the authority of his parents or guardians, or who is not permitted by law to make contracts and manage his own property. By the laws of Great Britain and of the United States, persons are minors till they are twenty-one years of age.'" *Rocky Mountain*, 121 F.4th at 125 (quoting NOAH WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828)).

The founders themselves were skeptical that "infants" under the age of 21 were sufficiently mature to exercise rights in the new democracy they were establishing. Thomas Jefferson, for example, "considered 'infants' akin to 'maniacs,' 'drunkards,' and others who 'cannot take care of themselves.'" *NRA*, 133 F.4th at 1117 (quoting Letter from Thomas Jefferson to Samuel Smith (May 3, 1823), *available at* https://perma.cc/YD6X-H6PN). "And, with respect to voting, John Adams explained that these individuals were not 'fit to be trusted by the [p]ublic' because of their lack of '[j]udgment' and '[w]ill.'" *Id.* (quoting Letter from John Adams to James Sullivan (May 26, 1776), *available at* https://perma.cc/HW9M-7YL2).

All this goes to show that, at the time the Second Amendment was ratified, "minors" under the age of 21 "were subject to the power of their parents and depended on their parents' consent to exercise rights and deal with others in society." *NRA*, 133 F.4th at 1118. These restrictions on minors' ability to exercise rights directly affected their ability to possess firearms. Because founding-era American society believed that minors under the age of 21 "lacked the judgment and discretion to enter contracts and to receive the wages of their labor," those minors

"generally could not purchase *firearms*" in particular *Id.* (emphasis added); *see McCoy*, 140 F.4th at 577 ("the infancy doctrine demonstrates that there was an early American tradition of burdening the ability of 18- to 20-year-olds to purchase goods, including firearms").

To understand why, start with the historical fact that minors under the age of 21 were generally unable to form contracts at the time of the founding. "All 'contracts with infants, except for necessaries, [were] either void or voidable' because 'infants . . . are supposed to want judgment and discretion in their contracts and transactions with others.'" *NRA*, 133 F.4th at 1118 (quoting 1 SAMUEL COMYN, A TREATISE OF THE LAW RELATIVE TO CONTRACTS AND AGREEMENTS NOT UNDER SEAL 148 (1809)). "By the early nineteenth century, voidability was applied so 'broadly' that 'it became *almost impossible* for children to form *any* contracts.'" *Id.* "[A]n infant who 'live[d] with his father or guardian' who adequately cared for him, could not 'bind himself even for *necessaries*'" like food, clothing, and shelter. *Id.* "Put simply, 'whoever entered into a contract with an infant could lose substantial amounts of money' because courts refused to hold minors accountable for payment." *McCoy*, 140 F.4th at 577.

"The inability to contract impeded minors from acquiring firearms during the Founding era" because "'contracts were more important for the basic transactions of society' than today." *NRA*, 133 F.4th at 1118. "The purchase of goods, including firearms, required the ability to contract because people often bought goods on credit." *Id.* (citing founding-era cases); *see McCoy*, 140 F.4th at 576 ("Eighteenth-century America was a credit economy."). "And since infants could 'not be held liable for failing to uphold their side of a contract over goods,' extending credit to minors was a 'considerable risk.'" *Id.* "That 'high risk made infants effectively unable to' purchase goods on credit." *Id.*

Nor could minors under the age of 21 purchase firearms with cash. For one thing, historians have inspected "the 'account books [that] survive'" from the founding era and determined "'that very little cash changed hands,' 'purchasers who paid in cash were rare,' and because of the 'shortage of a circulating medium,' 'credit rather than cash payment was the rule everywhere.'" *McCoy*, 140 F.4th at 576; *see id.* ("coin was scarce during the founding era"). For another, minors under the age of 21 "lacked disposable income to otherwise purchase firearms because they either worked for their parents for no wages, or any wages earned belonged to their parents." *NRA*, 133 F.4th at 1118 (citations omitted). "Furthermore, even if an infant had enough coin to buy a gun, merchants would have been unwilling to sell because they bore the risk that the minor would rescind the transaction and be entitled to a full refund under the infancy contract doctrine." *Id.* (citing *Riley v. Mallory*, 33 Conn. 201 (1866), for the proposition "that seller of a firearm was required to give a full refund to minor who insisted on returning used gun").

Founding-era militia laws and university regulations confirm that our nation's regulatory tradition imposed substantial firearm restrictions on minors. "Because of the legal incapacity of individuals under the age of 21, states enacted laws at the Founding to address minors' inability to purchase firearms required for their militia service." *NRA*, 133 F.4th at 1119. Consider the Milita Act enacted by the Second Congress to require "'able-bodied' men between the ages of 18 and 45" to enroll in the militia and "'provide [themselves] with a good musket or firelock.'" *Id.* (quoting Act of May 8, 1792, 1 Stat. 271, 271). Congress "recognized that individuals between the ages of 18 and 21 would need their parents to provide them weapons to comply with the Act." *Id.* (citing debates). And "States addressed the problem of providing minors the firearms necessary for militia service in different ways": some "exempted minors from the firearm requirement entirely," some explicitly "required parents of minors to acquire firearms for their

militia service," and others "implicitly required parents to supply minors with firearms because those states held parents liable for minors' fines related to militia service, including the failure to obtain a firearm." *Id.* (citing contemporaneous state laws). These militia laws demonstrate that, "[d]uring the Founding era, minors generally lacked unrestricted access to firearms." *Id.* at 1120.

On top of this, "[u]niversity regulations from the Founding era also confirm that minors needed parental consent to access firearms." *NRA*, 133 F.4th at 1120. "At the Founding, '[c]ollege authorities stood in the place of parents to the students entrusted to their care.'" *Id.* "Acting *in loco parentis*, universities could impose '[a]ny rule or regulation for the betterment of' their students' 'physical, moral, and mental welfare.'" *Id.* (citing BLACKSTONE at 453 for the proposition that "[a] father could 'delegate part of his parental authority, during his life, to the tutor or schoolmaster of his child'"). "Exercising this parental authority, universities commonly restricted firearm access both on and off campus." *Id.*

This discussion has focused on founding-era sources to evidence our nation's historical tradition of firearm regulation. *See Bruen*, 597 U.S. at 28 (Second Amendment's "meaning is fixed according to the understandings of those who ratified it"). But "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791," *United States v. Rahimi*, 602 U.S. 680, 691-92 (2024), and the Supreme Court has recognized that "postratification history of a 'regular course of practice can liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution,'" *NRA*, 133 F.4th at 1116 (quoting *Bruen*, 597 U.S. at 35-36) (cleaned up); *see District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) ("address[ing] how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century"). The Seventh Circuit agrees that

"evidence stretching into the nineteenth century is useful to a *Bruen* inquiry." *Schoenthal v. Raoul*, 150 F.4th 889, 913 (7th Cir. 2025), *cert. denied*, 2026 WL 922526 (U.S. Apr. 6, 2026).

So it's worth emphasizing that, "[i]n the second half of the nineteenth century, 20 jurisdictions enacted laws that restricted access to arms for minors." *NRA*, 133 F.4th at 1121; *see McCoy*, 140 F.4th at 578-79 ("An illustrative example is Indiana's 1875 law, which made it 'unlawful for any person to sell . . . to any other person, under the age of twenty-one years, any pistol.'").* "Most of those laws prohibited *all* methods of providing arms to individuals under the age of 21." *NRA*, 133 F.4th at 1121 (emphasis added). "And only a few of these laws allowed parents to provide arms to their children." *Id.*; *see Picon*, 343 A.3d at 66 ("Founding-era and Reconstruction-era understandings of the right to keep and bear arms" both "restricted firearm possession by individuals under twenty-one").

To be sure, states began lowering the age of majority in the middle and later half of the twentieth century. *NRA*, 133 F.4th at 1121. "[F]or much of the first two centuries of our nation," however, "our law limited the rights of individuals under the age of 21." *Id.*; *see Bruen*, 597 U.S. at 66 (even "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence"); *Picon*, 343 A.3d at 66 (meaning of "Second Amendment does not turn 'on an evolving standard of adulthood'"). And while the age of majority has changed, "'[m]any states (and the District of Columbia)'" continue to "'proscribe

* *See* 1855–56 Ala. Laws 17; Tenn. Code § 4864 (1858), *reprinted in* The Code of Tennessee Enacted By the General Assembly of 1857– '8, at 871 (Nashville, E. G. Eastman & Co. 1858); 1860 Ky. Acts 245; 1875 Ind. Acts 59; 1876 Ga. Laws 112; 1878 Miss. Laws 175; Mo. Rev. Stat. § 1274 (1879), *reprinted in* 1 The Revised Statutes of the State of Missouri 1879, at 224 (Jefferson, Carter & Regan 1879); 16 Del. Laws 716 (1881); 1881 Ill. Laws 73; 1882 Md. Laws 656; 1882 W. Va. Acts 421; 1883 Kan. Sess. Laws 159; 1883 Wis. Sess. Laws 290 (vol. 1); 1884 Iowa Acts 86; 1885 Nev. Stat. 51; 1890 La. Acts 39; 1890 Wyo. Terr. Sess. Laws 140; J. A. Van Orsdel & Fenimore Chatterton, Revised Statutes of Wyoming in Force December 1, 1899, at 1253 (Laramie, Chaplin, Spafford & Mathison 1899) (codifying the territorial law); 27 Stat. 116–17 (1892); 1893 N.C. Sess. Laws 468–69; 1897 Tex. Gen. Laws 221–22.

or restrict the sale of handguns to persons under 21.'" *McCoy*, 140 F.4th at 579. "These widespread restrictions on handgun sales to those under 21 are testament to the continuity of the historical tradition" that dates to the founding era when the Second Amendment was ratified. *Id.*

**B. The challenged Illinois law fits comfortably within this regulatory tradition.**

Courts reviewing a Second Amendment challenge "must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692. Two considerations play a crucial role in the analysis: "Call them the 'why' and 'how.' The more closely a contemporary law mirrors a well-established historical analogue in purpose and operation, the more likely it is to be upheld." *Hemani*, 2026 WL 1751710, at *5.

The challenged Illinois law fits comfortably within our "regulatory tradition of restricting access to firearms based on age for those considered to lack the judgment and discretion to use them safely." *Picon*, 343 A.3d at 65. Start with the "why" (or purpose). Illinois requires people between the ages of 18 and 20 to obtain their parents' consent to possess and acquire firearms because of the same concerns reflected in our nation's historical tradition of firearm regulation: minors generally "lack[ ] the reason and judgment necessary to be trusted with legal rights." *NRA*, 133 F.4th at 1117; *see McCoy*, 140 F.4th at 577 (historical tradition reflects "a recognition that individuals under the age of 21 lack good judgment and reason"); *Picon*, 343 A.3d at 66 ("With respect to the 'why,' the District's regulations" prohibiting people under the age of 21 from possessing firearms "address the same problems as historical age-based restrictions on firearm access: preventing those deemed to lack reason, maturity, and judgment from obtaining firearms."). For what it's worth, these concerns are justified: "psychological studies provide that individuals in their late teens and early 20s are less mature than adults in several significant and

relevant ways," including a greater propensity "to engage in what psychologists call 'sensation-seeking'" and a reduced ability "'to control their impulses and consider the future consequences of their actions and decisions.'" *Rocky Mountain*, 121 F.4th at 126.

The "how" (or operation) of the challenged law also closely mirrors the regulatory tradition. People between the ages of 18 and 20 may obtain a FOID card allowing them to possess and acquire firearms under Illinois law if they have their parents' permission. 430 ILCS 65/4(a)(2)(i-5). Similarly, at the time the Second Amendment was ratified, "minors" under the age of 21 "were subject to the power of their parents and depended on their parents' consent to exercise rights and deal with others in society." *NRA*, 133 F.4th at 1118; *see id.* at 1120 ("[u]niversity regulations from the Founding era also confirm that minors needed parental consent to access firearms"). The common theme is that both the challenged Illinois law and our nation's regulatory tradition generally allow parents to determine whether their children under the age of 21 are sufficiently mature and responsible to be entrusted with dangerous weapons that easily can be misused. *See NRA*, 133 F.4th at 1123 ("Florida law burdens the right no more than these historical restrictions because it prohibits purchase but preserves access to firearms with parental consent.").

**C. Plaintiffs' contrary cases fail to persuade.**

Plaintiffs rely on two contrary cases, but neither is persuasive. *Reese v. ATF*, 127 F.4th 583 (5th Cir. 2025), pays scant attention to the founding-era tradition of treating people under the age of 21 as "infants." Instead, the court focused on the Milita Act of 1792, which it thought was "evidence that eighteen-to-twenty-year-olds enjoyed the same Second Amendment rights as their twenty-one-year-old peers at the founding." *Id.* at 596. In fact, the Milita Act simply "required a militiaman to '*provide* himself with a good musket or firelock.'" *McCoy*, 140 F.4th at 578

(quoting Act of May 8, 1792, § 1, 1 Stat. 271, 271 (1792)). "There were of course many ways for an infant to 'provide' himself with a firearm without going out and purchasing one himself. A minor could use the family gun, for instance." *Id.* Indeed, "[b]y 1826, at least 21 of the 24 states admitted to the Union—representing roughly 89 percent of the population—had enacted laws that placed the onus on *parents* to provide minors with firearms for militia service." *NRA*, 133 F.4th at 1120 (emphasis added and citation omitted). This is consistent with the challenged Illinois law, which simply requires parental permission to possess and acquire firearms.

As for *Eubanks v. State*, No. 4D2025-1698, 2026 WL 1740598, at *9 (Fla. Dist. Ct. App. June 17, 2026), the court acknowledged that "[t]he framers defined adulthood as starting at age 21" but thought it was relevant that "the definition and understanding of adulthood changed in the present world to be understood as starting at 18." This focus on modern regulations is inconsistent with the Supreme Court's holding that the Second Amendment's "meaning is fixed according to the understandings of those who ratified it." *Bruen*, 597 U.S. at 28. *Eubanks* does not reflect a faithful application of the Supreme Court's precedents.

**II. Plaintiffs have not shown they are likely to suffer irreparable harm.**

Plaintiffs are unlikely to succeed on the merits of their Second Amendment claim, and this shortcoming is "'decisive'": they are not entitled to a preliminary injunction, and the Court "need not address the remaining elements." *Doe v. University of Southern Indiana*, 43 F.4th 784, 791 (7th Cir. 2022). But if the Court soldiers on, Plaintiffs also have failed to establish that they are likely to suffer irreparable harm in the absence of an injunction.

All Plaintiffs have to say about this essential element of the preliminary injunction standard is that, "by virtue of having their constitutional rights violated," they "are likely to suffer irreparable harm in the absence of preliminary relief." ECF 11 at 12. Although they do not

cite it, presumably Plaintiffs are referring to *Ezell v. Chicago*, 651 F.3d 684 (7th Cir. 2011), which some litigants think stands for "the proposition that there is a presumption of irreparable harm in all Second Amendment challenges." *Herrera v. Raoul*, 670 F. Supp. 3d 665, 680 (N.D. Ill. 2023). In fact, a careful reading of *Ezell* shows that it does not "create such a wide-ranging presumption for Second Amendment cases." *Id.* at 681; *see Bevis v. Naperville*, 85 F.4th 1175, 1202 (7th Cir. 2023) ("we have no need to decide whether an alleged Second Amendment violation gives rise to a presumption of irreparable harm").

Because Plaintiffs cannot rely on a presumption, they must put forward some sort of evidence (or at least argument) establishing that they are suffering irreparable harm. "Issuing a preliminary injunction based only on a *possibility* of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis added).

Plaintiffs have not attempted to carry their burden. This is reason alone for the Court to deny their preliminary injunction motion. Regardless, the "irreparable harm" analysis "takes into account how urgent the need for equitable relief really is." *Michigan v. United States Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011). And Plaintiffs' own conduct shows that they do not have an urgent need for equitable relief.

Even assuming Plaintiffs' parents have a genuine conscientious objection to consenting to their children's FOID card applications, Plaintiffs easily could have "petition[ed] the Firearm Owner's Identification Card Review Board or the circuit court for relief." *Thompson*, 264 N.E.3d at 32, 2024 IL App (1st) 221031, ¶ 27. Regardless of whether taking this additional step is required to state a cause of action, *see* ECF 11 at 2, Plaintiffs' failure to take advantage of all

available remedies is relevant to the question whether they are suffering irreparable harm. Rather than pursue a relatively straightforward mechanism for obtaining a FOID card, Plaintiffs instead ask the Court to issue "an 'extraordinary' equitable remedy," *Starbucks*, 602 U.S. at 345, that is "never to be indulged in except in a case clearly demanding it," *Cassell v. Snyders*, 990 F.3d 539 (7th Cir. 2021) (cleaned up). Plaintiffs' choice to forego the much simpler administrative alternative is strong evidence that they are not facing a true emergency as things stand.

On top of this, Plaintiffs filed their complaint in February 2026, ECF 1, but waited two months to serve Defendant, ECF 5 at 1, ¶ 2, and another two months to file their preliminary injunction motion, ECF 11. This unexplained delay fatally undermines any suggestion that Plaintiffs are suffering truly irreparable harm. *See, e.g.*, *American Academy of Pediatrics v. Uthmeier*, No. 26-2238, 2026 WL 1785466, at *11 (7th Cir. June 22, 2026) (delay of three months "shows a lack of urgency that is inconsistent with the current claim of irreparable harm"); *Kerwin ex rel. NLRB v. Trinity Health Grand Haven Hospital*, 174 F.4th 942, 958-59 (6th Cir. 2026) (four-month "delay undercuts the 'sense of urgency' implied by [preliminary injunction motion] and 'suggests that there is, in fact, no irreparable injury'"); *Delaware State Sportsmen's Association v. Delaware Department of Safety & Homeland Security*, 108 F.4th 194, 206 (3d Cir. 2024) ("four-month delay" in seeking relief "suggests that [plaintiff] felt little need to move quickly" and "support[s] denying a preliminary injunction").

## III. The equities and public interest weigh decisively against preliminary relief.

Finally, balancing the equities and considering the public interest establishes conclusively that Plaintiffs' preliminary injunction motion should be denied. A state suffers "'irreparable injury'" whenever it "'is enjoined by a court from effectuating statutes enacted by representatives of its people.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012). Put differently, when the party

"opposing" an injunction "is the representative of the political branches of a government[,] the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Illinois Bell Telephone Co. v. WorldCom Technologies, Inc.*, 157 F.3d 500, 503 (7th Cir. 1998).

These crucial public interests are not diminished simply because Plaintiffs allege that they are suffering a violation of their Second Amendment rights. "Just as the Second Amendment protects the right of the people to keep and bear arms, the democratic process protects the right of the people to the blessings of self-government." *McCoy*, 140 F.4th at 580. And it is "clear from the [Supreme] Court's decisions that individual and democratic rights do not extinguish one another in this important area and, further, that it is not impermissible for lower courts to attempt some demonstration of respect for both." *Id.*

As explained, the challenged Illinois law promotes public safety by ensuring that people between the ages of 18 and 20 can possess firearms only if they have their parents' permission. This requirement helps to ensure that firearms are available only to those young people who are sufficiently mature and responsible. "A rational person could believe that" the challenged law thereby "facilitates" public safety, and that is all that "is necessary to show that an injunction" against the law's enforcement "will impose irreparable harm on the people of" Illinois. *McKenzie v. Chicago*, 118 F.3d 552, 557 (7th Cir. 1997).

Plaintiffs do not address either the balance of the equities or the public interest. Again, this is reason alone to deny their preliminary injunction motion. *Winter*, 555 U.S. at 23-24.

## CONCLUSION

For all these reasons, the Court should deny plaintiffs' motion, ECF 11, to the extent it seeks a preliminary injunction.

Dated: July 6, 2026

Respectfully submitted,

/s/ Darren Kinkead

Darren Kinkead
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov

**CERTIFICATION**

I certify that this brief complies with the type volume limitation in Civil Local Rule 7.1(B)(4)(b)(1) because it contains 5,312 words.

/s/ Darren Kinkead